# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF WISCONSIN

PATRICK FAGAN,

P&P PRODUCTS,

PATRICK FAGAN'S STOCKHOLDER INTERESTS, AND AS SUCH,

ASSIGNED BUSINESS INTERESTS IN URBAN SUSTAINABLE AQUAPONICS AND

RACINE INDOOR MOTOCROSS,

3943 Pinehill Blvd, Mt. Pleasant, WI 53403

    Plaintiff,

v.

CASE NO.: **26-C-0798**

CITY OF RACINE, a Wisconsin municipal corporation, 730 Washington, Racine, WI

53403

REDEVELOPMENT AUTHORITY OF THE CITY OF RACINE, 730 Washington,

Racine, WI 53403

RODNEY BLACKWELL, individually (Iowa), 2736 Eagle Heights Ct,

Bettendorf, IA 52722-6331

JAMES K. BOWMAN, individually (Illinois), 4836 6th Avenue Dr, Moline, IL 61265

FDP MR, LLC (Wisconsin), 201 N. Harrison Street, Suite 402, Davenport, IA 52801

1

FINANCIAL DISTRICT PROPERTIES, LLC (Iowa), 201 N. Harrison Street, Suite 402, Davenport, IA 52801

FDP ACQUISITIONS, LLC (Iowa), 201 N. Harrison Street, Suite 402, Davenport, IA 52801

THOMAS FRIEDEL, individually, 1904 Dwight St, Racine, WI 53403

JOHN DICKERT, individually, 151 Westminster Square, Racine, WI 53402

CORY MASON, individually, 3907Lighthouse Dr., Racine, WI 53402

JAMES M PALENICK, individually, 6413 Kings Canyon Cove NE, Rio Rancho, New Mexico 87144

ELAINE EKES, individually, 2910 Green St, Racine, WI 53402

LANDMARK TITLE OF RACINE, INC., 719 Washington Ave, Racine, WI 53403

ROBERT WEBER, individually, 35 HARBORVIEW DR #317 RACINE, WI 53403

SCOTT LETTENEY, individually, N3299 Sycamore Rd, Geneva, WI, 53147

NICOLE LARSEN, individually, 414 E Bolivar Ave, Milwaukee, WI 53207

LAURA SADLER, individually, 2803 S Kinnickinnic Ave, Milwaukee, WI 53207

TERRA VENTURE ADVISORS, 13500 Watertown Plank Rd, Suite 200, Elm Grove, WI 53122

JOHN DOES 1-2, individually Defendants.

**COMPLAINT FOR VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO), 18 U.S.C. §§ 1962(c) AND (d), AND SUPPLEMENTAL STATE LAW CLAIMS**

**DEMAND FOR JURY TRIAL**

## I. INTRODUCTION AND SHORT AND PLAIN STATEMENT (FRCP 8(a)(2))

1. This action arises from a multiyear interstate racketeering scheme in which public officials of the City of Racine, together with private developers, attorneys, and related entities, concealed the City's ownership and use of federal funds in acquiring Machinery Row properties to evade mandatory obligations under the Uniform Relocation Assistance and Real Property Acquisition Policies Act ("URA"), 42 U.S.C. §§ 4601 et seq., and Wisconsin relocation statutes.

2. From September 2014 through at least December 2017—and continuing through 2023—Defendants used interstate mail and wire communications to misrepresent acquisitions as purely private transactions, conceal unrecorded

3

deeds transferring title directly to the City, and replicate the same fraudulent methodology across additional Racine redevelopment projects. A substantial part of these events occurred in the Eastern District of Wisconsin and Racine County.

3. As a result, Plaintiff Patrick Fagan, a displaced commercial tenant operating P&P Products as a sole proprietorship at the Machinery Row site, suffered direct economic injury to his business and property as fully detailed in the dedicated Injury section below (¶¶ 79–81) and in (**Reference Exhibit M** and incorporated by reference as if fully set forth herein).

4. Plaintiff discovered the concealed deeds, misrepresented funding sources, false affidavits, and overfunded loan structure only in February 2023 through unsealed and produced court filings in the related litigation Azarian v. City of Racine, Case No. 19-CV-1524. Specifically, document production and unsealing of settlement-related materials revealed the December 31, 2014, Quit Claim Deeds (and the January 2015 deeds for additional parcels) transferring title directly from FDP MR, LLC to the City of Racine, which had been held unrecorded in Defendant Ekes' legal files for years. The full scope of the concealment is further illustrated by the undisclosed settlement in the related Azarian litigation (**Reference Exhibit V** and incorporated by reference as if fully set forth herein).

4

5. Defendants actively concealed these material facts through: (a) unrecorded deeds never filed in the Racine County Register of Deeds before 2018 and therefore invisible to any title search or public records database; (b) false public statements, press releases, Legistar filings, and Common Council presentations repeatedly describing the Machinery Row project as "private development" with no public ownership or federal involvement; (c) affidavits in the Azarian litigation expressly denying public ownership and federal funding; (d) sealed and confidential settlement agreements and discovery materials that prevented public disclosure of the true acquisition structure; and (e) the complete failure to provide mandatory URA notices or relocation advisory services to displaced tenants, including Plaintiff.

6. In addition, the City took active steps to maintain the false appearance of private ownership: it declared FDP MR, LLC in default on the very loan the City itself funded and controlled (including interest payments), even though FDP MR never made a single loan payment of any kind; FDP MR never paid property taxes on the properties; and the City secretly paid for roof repairs on 820 Water Street. The City only foreclosed on the public loan and recorded the deeds it had possessed since December 31, 2014 (900 Water Street – Olson parcel) and January 2015 (820 Water Street – Jensen parcel, plus multiple Azarian properties, including 740 Water Street) after

5

completing the fraudulent Knowles-Nelson grant/wire transfer in April 2017. Plaintiff, a pro se commercial tenant without subpoena power, could not have discovered these facts through reasonable diligence before 2023 because the critical documents and internal City actions were maintained exclusively in Defendant Ekes' legal files and the City Attorney's Office. This case does not challenge ordinary redevelopment decisions or discretionary government actions. Rather, it challenges a coordinated scheme in which Defendants affirmatively misrepresented the nature of property acquisitions to avoid mandatory statutory obligations, thereby directly depriving Plaintiff of specific, legally guaranteed economic benefits. This case challenges a scheme that specifically targeted displaced tenants such as Plaintiff through direct misrepresentations and coerced waivers to evade URA obligations.

7. Plaintiff brings RICO claims under 18 U.S.C. §§ 1962(c) and 1962(d) against the non-municipal Defendants (including the individual municipal officials in their personal capacities) only and seeks declaratory and injunctive relief against the municipal entities (City of Racine and RDA).

## II. JURISDICTION, VENUE, AND PARTIES

### A. Jurisdiction

6

8. This Court has federal question jurisdiction under 28 U.S.C. § 1331 and civil RICO jurisdiction under 18 U.S.C. § 1964(c). Supplemental jurisdiction over state claims exists under 28 U.S.C. § 1367.

**B. Venue**

9. Venue is proper in this District under 28 U.S.C. § 1391(b) and 18 U.S.C. § 1965(a) because a substantial part of the events or omissions giving rise to the claims occurred in this District, the properties are located here, and many Defendants reside or transact business here.

**C. The Parties**

10. Plaintiff Patrick Fagan is a Wisconsin citizen residing at 3943 Pinehill Blvd., Mt. Pleasant, WI 53403. He operated P&P Products, a sole proprietorship engaged in woodworking, at 615 S Marquette Street, Racine, from 2006 until displacement in December 2015 without receiving URA or state-law relocation benefits.

**Municipal Defendants (Declaratory and Injunctive Relief Only)**

11. The City of Racine is a Wisconsin municipal corporation organized and existing under the laws of the State of Wisconsin.

12. The Redevelopment Authority of the City of Racine ("RDA") is a public body corporate and politic organized under Wisconsin law. Plaintiff seeks only declaratory and injunctive relief against the City and RDA. Municipal entities are

7

generally immune from punitive or treble damage under civil RICO. See City of

Newport v. Fact Concerts, Inc., 453 U.S. 247 (1981). Municipal entities enjoy

Garcetti immunity for punitive damage, and civil RICO treble damages are

considered punitive. Genty v. Resolution Trust Corp., 937 F.2d 899 (3d Cir. 1991)

(holding municipalities immune from punitive damages under civil RICO).

Developer Defendants (Sued in Their Personal Capacities)

13. Rodney Blackwell is an Iowa resident and the sole beneficial principal of FDP

MR, LLC, Financial District Properties, LLC, and FDP Acquisitions, LLC, entities

used as conduits in the Machinery Row transactions.

14. James K. Bowman is an Illinois resident who participated as Blackwell's agent

and communicated directly with sellers, transmitting instructions and documents

across state lines.

Attorney and Title Defendants (Sued in Their Personal Capacities)

15. Elaine Ekes is a Wisconsin attorney who drafted key concealing documents,

including the City Developers Agreement, escrow agreements, and waivers. Ekes

is distinct from Enterprise because she is a private attorney retained by the City

to provide independent legal services, is subject to separate ethical obligations

under Wisconsin's Rules of Professional Conduct and personally profited from

her participation through attorney fees. She had the capacity and incentive to

decline participation in the fraudulent scheme and report it. Defendant Ekes is

8

distinct from the Enterprise and participated in its operation and management rather than merely providing legal advice because she: (a) drafted corporate resolutions directing RDA expenditures and conditioned transactions on her approval; (b) possessed independent decision-making authority over escrow account conditions controlling federal funds; (c) exercised independent decision-making authority regarding recording protocols contrary to standard title practices, without direction from clients; (d) received compensation contingent upon transaction completion, creating economic incentive to approve fraudulent structures; (e) failed to disclose conflicts of interest while acting as City Attorney and private counsel simultaneously; (f) directed subordinates (paralegals, staff attorneys) to prepare specific concealing documents with direct knowledge they would prevent URA compliance. Ekes did not merely advise on legal risks or provide formal legal opinions; rather, she actively directed the transactional structure by negotiating and increasing the sellers' environmental cashback provision to align with the pre-planned City Developers Agreement, then restructuring the escrow to divide funds between the City (for hidden loan interest) and FDP MR, LLC (as an unrestricted incentive to the straw purchaser). In doing so, she exercised control over the flow of property titles, directed the preparation of concealing documents, and orchestrated key elements of the scheme, distinguishing her conduct from that of an ordinary outside attorney. (g)

9

personally negotiating and increasing the sellers' environmental cashback provision independently to align with the pre-planned City Developers Agreement; (h) restructuring the escrow agreement to divert funds between the City's hidden loan interest account and FDP MR, LLC's unrestricted incentive payment without specific client instruction to do so in that manner; (i) directing that the Quit Claim Deeds remain unrecorded contrary to standard Wisconsin title-recording practices and without client directive, thereby controlling the flow of title information essential to the concealment scheme; and (j) conditioning all dependent acquisitions—including Plaintiff's displacement at 615 S. Marquette Street—on her personal approval of the concealing documentation. These actions went far beyond the provision of ordinary legal advice and constituted direct participation in the operation and management of the Enterprise. See Reves v. Ernst & Young, 507 U.S. 170, 179 (1993); Jaguar Cars, Inc. v. Royal Oaks Motor Car Co., 46 F.3d 258 (3d Cir. 1995) (professional liable where he or she exercises independent decision-making authority over key aspects of the enterprise's affairs).

16. Robert Weber, former City Attorney, supervised Ekes, approved the closing documents, and signed them. Weber is distinct from the Enterprise because he is appointed by and answerable to the mayor, has independent ethical obligations as an attorney, could have refused to participate in the fraudulent scheme, and

10

was separately compensated for his legal services. Weber participated in the operation and management by: (a) having final approval authority over all City Attorney Office litigation strategies in the Azarian case; (b) directing subordinate attorneys regarding the content of affidavits; (c) possessing policy-making authority over city-wide relocation assistance protocols as City Attorney; (d) personally reviewing and approving settlement agreements containing confidentiality provisions that concealed the scheme; (e) exercising supervisory control over City and RDA legal decisions, including veto power over disclosed transactions. Weber functioned as an executive-level manager of Enterprise's legal affairs, not an outside advisor.

17. Scott Letteney, current City Attorney, participated in legal review and oversight of relocation obligations and federal funding representations, and exercised operational control over RDA property acquisition decisions as City Attorney. Letteney is distinct from the Enterprise because he is an independent city officer appointed by the Common Council, has separate ethical duties as an attorney licensed by the State of Wisconsin, and is separately compensated for his legal services. Letteney could have, but refused to, prevent the fraudulent scheme. Letteney participated in the operation and management by: (a) directing the RDA's continued non-compliance with URA after 2017; (b) possessing signature authority on TID-18 organizational approval. (c) supervising the City's

11

defense in Azarian, including decisions regarding which documents to withhold from production under discovery; (d) exercising operational control over property acquisition decisions as reflected in Resolution 17-31; (e) personally meeting with Blackwell/Bowman to structure subsequent transactions. Letteney's role extended beyond legal advice to operational control over redevelopment decisions. (f) personally directed and managed the City's and RDA's response to Plaintiff's 2017 and 2018 state court actions (Case Nos. 2017CV001703 and 2018CV001227), including oversight of the retroactive relocation plan, the hired relocation agent, and the token benefit payments provided to Plaintiff; (g) directed and oversaw the City's and RDA's responses to claims filed by other similarly situated tenants, including Richard Olson, Racine Indoor Motocross LLC, Marquette Warehouse, LLC, Marquette Distribution Center LLC, Urban Sustainable Aquaponics, LLC, Riverside Business Center, LLC, all dismissed claims except Marquette Warehouse LLC received token mediation reimbursement for building cleanup settlements, as reflected in the Olson State Case filings (**Reference Exhibit U** and incorporated by reference as if fully set forth herein), in Racine Indoor Motocross LLC et al. v. Redevelopment Authority of the City of Racine, Case No. 2018CV001250, and the handling of the Azarian litigation and settlement. Defendant Letteney's direct involvement in TID 18 matters is

12

evidenced by his signature on the TID 18 Legal Review (**Reference Exhibit G** and incorporated by reference as if fully set forth herein).

18. Landmark Title of Racine, Inc. is a Wisconsin corporation engaged in title insurance and escrow services. Landmark Title is distinct from Enterprise because it is a private corporation, not a city agency, is separately licensed by the State of Wisconsin, and has the authority to decline to participate in or report the fraudulent scheme.

19. Defendant NICOLE LARSEN is an individual who served as Deputy City Attorney and participated in the racketeering enterprise through honest services fraud, suppression of public records, and concealment of the City's property interests to the finance committee on Oct 31, 2018. Larsen's role is further detailed in the Addendum/Supplement to Complaint (Reference Exhibit W), including additional predicate acts of wire fraud committed in 2017

20. Defendant LAURA SADLER is an individual who was illegally hired as a Relocation Specialist without public bidding and participated in the racketeering enterprise through program fraud, wire fraud, and unlawful denial of Uniform Relocation Assistance benefits.

21. Defendant TERRA VENTURE ADVISORS, LLC is the company of which Laura Sadler is President, and which entered into the fraudulent RICO contract with the City of Racine and the Redevelopment Authority for relocation services.

22. Defendants JOHN DOES 1-2 are individuals whose true identities are presently unknown to Plaintiff. Upon information and belief, John Does 1-2 participated in the racketeering enterprise through obstruction of justice and suppression of public records. Plaintiff will seek leave to amend to identify John Does 1-2 through discovery.

**Individual Municipal Officials (Sued in Their Personal Capacities)**

23. John Dickert, former Mayor, is sued in his individual and personal capacity. He signed the City Developers Agreement and authorized the overfunded loan structure as part of the Enterprise.

24. Thomas Friedel, former City Administrator, is sued in his individual and personal capacity. He participated in funding decisions and public statements representing the project as private.

25. Cory Mason, current Mayor, is sued in his individual and personal capacity. He supervised submission of false affidavits in related litigation from 2017 through 2023.

26. James Palenick, former City Administrator, is sued in his individual and personal capacity. He participated in the continued concealment of public involvement and federal funding through 2017 and beyond.

**III. FACTUAL BACKGROUND**

14

27. The Machinery Row redevelopment project involved multiple commercial properties along the Root River in Racine, Wisconsin, including 900 Water Street, 615 S. Marquette Street, 526 Marquette Street, and adjacent properties (collectively, the "Machinery Row Parcels").

28. Private purchase options for Machinery Row parcels expired on September 9, 2014. On September 25, 2014, Defendant James K. Bowman, from Illinois, emailed Machinery Row property sellers in Wisconsin describing a "simple fix" and "reset tactic" to continue the acquisition while representing it as a private transaction, despite the City's actual involvement (**Reference Exhibit E** attached hereto and incorporated by reference as if fully set forth herein).

29. On September 29, 2014, Defendant Elaine Ekes, under the supervision of Defendants Robert Weber and Scott Letteney, drafted a City Developers Agreement secretly structuring the City as the true purchaser while presenting the acquisition as private (**Reference Exhibit A** attached hereto and incorporated by reference as if fully set forth herein). The Agreement repurposed environmental remediation funds, required Blackwell to apply for HUD funding, and incorporated EPA and NOAA-supported planning components.

30. On December 31, 2014, the cornerstone and genesis of the entire racketeering scheme was the execution of the Quit Claim Deed by which Defendant Rodney Blackwell, through FDP MR, LLC, transferred direct title to 900 Water Street (the

15

Olson parcel) to the City of Racine. (**Reference Exhibit B** and incorporated by reference as if fully set forth herein). Defendant Elaine Ekes immediately took custody of the deed (and the January 2015 deeds for additional parcels) and, acting in concert with all other Defendants, deliberately held it unrecorded in her legal files. From the moment of its execution and delivery, this transfer constituted a public acquisition of real property using public and federal funds for a public redevelopment purpose. Mandatory URA obligations therefore attached ab initio under 42 U.S.C. §§ 4601 et seq. and 49 C.F.R. § 24.101(b)(1)-(2), as well as Wis. Stat. §§ 32.05, 32.06, 32.19, and 32.25. By concealing the deed and maintaining the false appearance of a purely private transaction, Defendants launched a fraudulent scheme whose every subsequent act was tainted from its inception. The ab initio fraudulent conveyance formed the foundation upon which the entire Machinery Row project — and the Enterprise's pattern of racketeering activity — was constructed. All later "dependent acquisitions," including the December 30, 2015, purchase of Plaintiff Fagan's leasehold at 615 S. Marquette Street, flowed directly from and were made possible by the secret title transfer that occurred on December 31, 2014. Because the title had already passed to the City, every subsequent closing, overfunded loan disbursement, wire transfer, grant application, public statement, Resolution 17-31 replication, and false affidavit in the Azarian litigation was infected by, and served to conceal, this

16

original fraud. Plaintiff Fagan's displacement without URA benefits was therefore not the result of an isolated private transaction, but the direct, intended, and foreseeable consequence of Enterprise's foundational ab initio fraudulent act. The December 30, 2015, acquisition of Plaintiff's leasehold at 615 S. Marquette Street was a dependent acquisition tainted by the ab initio public ownership. As a condition of closing and eviction, Defendants required execution of a false "Waiver of Relocation Rights" (**Reference Exhibit N** and incorporated by reference as if fully set forth herein). The purported "Waiver of Relocation Rights" (**Reference Exhibits N, N2, N3** and incorporated by reference as if fully set forth herein), executed for 615 S. Marquette Street is unenforceable and void ab initio because (a) the landlord lacked any authority to waive a tenant's statutory relocation rights, (b) the displacing agency and its agents were expressly prohibited from requesting or conditioning any transaction on such a waiver under 49 C.F.R. § 24.207(f) and Wis. Admin. Code Adm 92, and (c) it was procured through fraud and concealment of the public nature of the acquisition. This invalid waiver forms part of Defendants' pattern of racketeering activity and fraudulent concealment, tolling the statute of limitations until Plaintiff discovered the facts in 2023.

31. The City simultaneously issued an overfunded loan exceeding the net purchase price by approximately $450,000, enabling (a) $350,000 for Blackwell's

17

unrestricted use, (b) City control over $100,000 for loan interest, and (c) the false appearance that Blackwell had "skin in the game." These funds were disbursed through Landmark Title of Racine, Inc., which issued checks and wires across state lines (**Reference Exhibit I** and incorporated by reference as if fully set forth herein).

32. The City's concealment was not passive. Although FDP MR, LLC executed Quit Claim Deeds transferring 900 Water Street (Olson parcel) to the City on December 31, 2014, and additional deeds for 820 Water Street (Jensen parcel) and multiple Azarian properties (including 740 Water Street) in January 2015, the City deliberately held all deeds unrecorded. The City then took affirmative steps to perpetuate the sham "private ownership" façade: it declared FDP MR, LLC in default on the overfunded public loan (which the City itself controlled and for which it secretly paid the interest), even though FDP MR never made a single loan payment; FDP MR never paid any property taxes; and the City paid for roof repairs on 820 Water Street out of public funds as shown in the Tax and Repair Payment Records (**Reference Exhibit P** and incorporated by reference as if fully set forth herein). Only after Defendants completed the Knowles-Nelson Stewardship Program wire transfer of $470,750 in April 2017 (see ¶30 below) and (**Reference Exhibit** C, C-1, C-2, C3, C4, C5, C6, C7, C8) and incorporated by reference as if fully set forth herein). did the City finally foreclose on its own loan

18

and record the deeds it had held in its possession since late 2014 and early 2015. These actions were taken with the specific intent to conceal the public nature of the acquisitions and prevent URA obligations from being triggered. These actions are documented in the Loan Default, Foreclosure, Deed Registration, and Demolition (**Reference Exhibit** O, O1, O2, O3, O4, and incorporated by reference as if fully set forth herein).

33. The concealed December 31, 2014, deeds were the "but for" cause of subsequent acquisitions at 615 S. Marquette Street (acquired December 30, 2015) and 526 Marquette Street (acquired May 2015, with bifurcated final payment completed January 2016). These dependent acquisitions, framed as arm's-length, were carried out by the RDA using public funds for a public project, including environmental clean-up federal money, with closing conditioned after extorted building code improvements were completed (fire sprinkler upgrade, new fire water supply, and new heating units), and all tenants were evicted to circumvent URA.

34. On or about April 10, 2017, Defendants Friedel, Palenick, and Landmark Title received by wire transfer $470,750 in Knowles-Nelson Stewardship Program funds into escrow (**Reference Exhibit** C, C1, C2, C3, C4, C5, C6, C7, C8, and incorporated by reference as if fully set forth herein). These funds contained embedded federal LWCF and RTP dollars. Defendants represented these funds as

19

a matching grant to reimburse the City for a Promenade land purchase from Blackwell, knowing that (a) the City already held title to the property, (b) federal funds were being used, and (c) URA obligations were triggered.

35. Defendants also incorporated EPA Brownfields cleanup funds, HUD CDBG funds, and NOAA-supported planning components into the project while continuing to deny any public or federal involvement **(Reference Exhibit F** and incorporated by reference as if fully set forth herein).

36. On or about December 7, 2017, the RDA authorized Resolution 17-31, directing the acquisition of the Gospel Lighthouse Pentecostal Church of God property at 1230 Sixth Street, Racine, Wisconsin **(Reference Exhibit J** and incorporated by reference as if fully set forth herein). The resolution explicitly applies the identical methodology used at Machinery Row, citing the same TID 18 "blighted area" designation, the same Rootworks/Riverloop corridor redevelopment plan **(Reference Exhibit K** and incorporated by reference as if fully set forth herein), the same "arms-length acquisition" structure, and the same environmental concealment framework.

37. From 2017 through 2023, Defendants Friedel, Palenick, and Mason repeatedly described the Machinery Row project as private in public statements and communications **(Reference Exhibit H** and incorporated by reference as if fully set forth herein). In related litigation, including Azarian v. City of Racine, Case

20

No. 19-CV-1524, Defendants submitted false affidavits denying public involvement and federal funding (**Reference Exhibit L** and incorporated by reference as if fully set forth herein).

38. In February 2023, during the Azarian litigation, Defendant Ekes (under the supervision and approval of Defendants Weber and Letteney) caused the filing of the false statements outlined in Lucareli's Affidavit (**Reference Exhibit D** and incorporated by reference as if fully set forth herein), which represented the DOA "Waiver of Relocation Assistance" as "true and correct" and expressly stated that "Federal funds are not involved in any aspect of the project." Only upon review of these public filings did Plaintiff discover the December 31, 2014, unrecorded deeds transferring title directly to the City, the use of federal funds (HUD, EPA, NOAA, and embedded Knowles-Nelson dollars), the overfunded loan structure, and the full extent of the concealment.

39. Because the acquisitions were public or publicly assisted, the URA and Wisconsin relocation statutes required Defendants to provide relocation benefits, advisory services, and just compensation. Ekes provided a false "Waiver of Relocation" and required this by the Landlord as a condition of sale for 615 S Marquette and 526 Marquette (**Reference Exhibit N** and incorporated by reference as if fully set forth herein). Federal regulations establish that URA

21

obligations are attached when public entities acquire property directly or indirectly, or when federal funds are used. 49 C.F.R. § 24.101(b)(1)-(2).

**IV. THE RICO ENTERPRISE (18 U.S.C. § 1961(4))**

40. Defendants formed an association-in-fact Enterprise (the "Enterprise") that satisfies Boyle v. United States, 556 U.S. 938 (2009). The Enterprise had (a) a common purpose of concealing public ownership and federal funding to evade mandatory URA obligations while generating private benefits for Blackwell and the participants; (b) relationships among municipal officials, private developers, attorneys, and the title company; (c) longevity from September 2014 through at least February 2023, with prospective continuity through active TID 18 and Rootworks redevelopment authorizations; and (d) an ascertainable structure evidenced by the functional hierarchy described in the next paragraph. The Enterprise is distinct from each of the non-municipal Defendants within the meaning of Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 161–62 (2001). Enterprise is not merely the sum of the predicate acts or a conspiracy to commit them; it is a legally cognizable entity with structural features independent of the fraudulent scheme. The Enterprise possessed: (a) a formal governance hierarchy established by the City of Racine Municipal Code and RDA bylaws, including organized committees (Common Council, RDA Board) with defined voting protocols; (b) functional departments—specifically the City Attorney's Office, RDA

22

Development Department, and Mayor's Office—that operated continuously before, during, and after the fraudulent acquisitions; (c) corporate indicia including employer identification numbers, budgeting authority, and legal capacity to hold property; and (d) decision-making protocols evidenced by written resolutions (Resolution 17-31) and executed agreements (City Developers Agreement) requiring formal approval processes. The Enterprise functioned as a legitimate governmental entity with bona fide redevelopment purposes, which Defendants corrupted toward illegitimate ends. The Enterprise is distinct from each individual Defendant because it includes a combination of public officials, private developers, and independent corporate entities that functioned together as a coordinated unit separate from any single Defendant. The Enterprise's decision-making structure and coordinated activities cannot be reduced to the routine operations of the City or any one entity, but instead reflect a collaborative framework in which each Defendant pursued a shared unlawful objective while retaining independent economic and legal interests. The Enterprise is further distinct in that key participants—including FDP MR, LLC, Financial District Properties, LLC, FDP Acquisitions, LLC, and Landmark Title of Racine, Inc.—were not agents of the City but independent entities with separate ownership, profit motives, and legal obligations. These entities entered into coordinated transactions with municipal actors that extended beyond ordinary government

23

operations and created an association-in-fact enterprise within the meaning of RICO. The association-in-fact Enterprise is distinct from each individual Defendant. Each non-municipal Defendant participated in the Enterprise but retained separate and independent legal identities, economic interests, ethical obligations, and profit motives. Private attorneys Ekes, Weber, and Letteney owed independent duties under Wisconsin's Rules of Professional Conduct that the governmental Enterprise did not; the developer Defendants (Blackwell, Bowman, and the FDP entities) pursued separate profit incentives; and Landmark Title operated as a licensed, independent title and escrow agent. The Enterprise would continue to exist as the City's redevelopment apparatus even in the absence of any single Defendant. This satisfies the distinctiveness requirement of Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 161–62 (2001).

41. Enterprise functioned as an ongoing unit with a common purpose, coordinated relationships, and sufficient longevity to pursue its objectives. Its structure is evidenced by the coordinated roles of public officials, private developers, legal actors, and financial intermediaries working together to execute and conceal the acquisition scheme.

42. The Enterprise is distinct from the pattern of racketeering activity in that the Enterprise existed before and independent of the predicate acts, as evidenced by the RDA's incorporation, the City's long-standing administration of federal grants

24

prior to 2014, the existence of Rootworks planning documents from 2012, and the Enterprise's continued operation post-2017 on non-Machinery Row projects. The predicate acts were the means of infiltration of an otherwise legitimate enterprise, not the enterprise itself, satisfying the structural separateness requirement under Stachon v. United Consumers Club, Inc.

## V. PREDICATE ACTS OF RACKETEERING ACTIVITY (MAIL AND WIRE FRAUD)

43. Each act below was committed in furtherance of the Enterprise's scheme to defraud, constitutes mail fraud under 18 U.S.C. § 1341 or wire fraud under 18 U.S.C. § 1343, and is pled with particularity under FRCP 9(b).

44. On or about September 25, 2014, Defendant James K. Bowman, then in Illinois, sent an interstate email to Machinery Row property sellers in Wisconsin describing a "simple fix" and "reset tactic" to continue the acquisition while representing it as a private transaction (**Reference Exhibit E** and incorporated by reference as if fully set forth herein).

45. At the time Bowman sent this email, he knew the City was the true purchaser and that the acquisition would use federal funds. Bowman's email was false because: (a) the City was the true purchaser; (b) the acquisition would use federal funds from HUD, EPA, and Knowles-Nelson grants; and (c) no legitimate private transaction existed. Bowman sent this email across state lines via electronic transmission to sellers in Wisconsin intending to secure their consent to

25

continued negotiations while concealing the City's involvement. This constituted wire fraud under 18 U.S.C. § 1343, initiating the fraudulent scheme that denied Plaintiff URA benefits. See Paragraph 24.

46. Between September 29, 2014, and December 31, 2014, Defendant Elaine Ekes, under the supervision of Defendants Robert Weber and Scott Letteney, transmitted interstate emails containing drafts and final versions of the City Developers Agreement to parties in Iowa, Illinois, and Wisconsin (**Referenced Exhibit A** and incorporated by reference as if fully set forth herein). City Developers Agreement, September 29, 2014, These emails were false because they represented that Blackwell was acquiring the properties for private development when in fact: (a) the City was the true purchaser; (b) the Agreement required Blackwell to apply for federal HUD funding; (c) the Agreement incorporated EPA and NOAA-supported planning; and (d) the City would take title to the properties.

47. Ekes, Weber, and Letteney knew these representations were false when made. These interstate emails constituted wire fraud under 18 U.S.C. § 1343, concealing the public/federal nature of the acquisition that triggered URA obligations. See Paragraph 25.

48. On or about December 31, 2014, Defendants Blackwell and Ekes caused to be mailed or couriered instruments, including unrecorded Quit Claim Deeds transferring 900 Water Street to the City of Racine (**Reference Exhibit B** and

26

incorporated by reference as if fully set forth herein).  These documents were sent: (a) via mail or courier from the closing location to Ekes' custody; (b) with instructions that the deeds remain unrecorded; and (c) in a scheme to conceal the City's ownership from public records. These mailed documents were part of a scheme to defraud because they: (i) concealed the true owner of the property; (ii) prevented discovery by displaced tenants of their URA rights; (iii) allowed Defendants to represent the project as private when it was public. These mailings constituted mail fraud under 18 U.S.C. § 1341, preventing Plaintiff from learning of his URA rights in 2014-2016. See Paragraph 26.

49. On or about December 31, 2014, Defendants caused interstate wire transfers totaling approximately $450,000 to Blackwell's accounts and entities in Iowa and Wisconsin. These wires were made through Landmark Title of Racine, Inc. and used: (a) telephonic, electronic, and wire communication facilities in interstate commerce; (b) to transfer funds exceeding the actual purchase price; (c) to create the false appearance that Blackwell had "skin in the game" when the City was the true source; (d) to compensate Blackwell while concealing the City's direct ownership (**Reference Exhibit I** and incorporated by reference as if fully set forth herein), and incorporated by reference as if fully set forth herein).  These wires constituted wire fraud under 18 U.S.C. § 1343 because they were used to: (i) further the scheme to conceal public ownership; (ii) compensate straw

27

purchasers; (iii) deprive displaced tenants of URA benefits; and (iv) launder transaction proceeds. These wire transfers were used to fund the scheme that denied Plaintiff relocation benefits. See Paragraph 27.

50. In 2015, Defendants caused to be mailed closing packets and related documents for dependent acquisitions at 526 and 615 S. Marquette Street. These mailings were: (a) sent through the U.S. Postal Service or commercial courier in interstate commerce; (b) represented that RDA was acquiring the properties; (c) concealed the City's unrecorded ownership; (d) failed to disclose use of federal funds. These mailings constituted mail fraud under 18 U.S.C. § 1341, because these dependent acquisitions relied on the initial fraudulent structure and expanded the project without URA compliance. See Paragraphs 28 and 29.

51. On or about April 10, 2017, Defendants caused an interstate wire transfer of $470,750 in Knowles-Nelson Stewardship Program funds (**Reference Exhibit C, C1, C2, C3, C4, C5, C6, C7, C8,** and incorporated by reference as if fully set forth herein). This wire: (a) was transmitted electronically across state lines; (b) contained embedded federal LWCF (Land and Water Conservation Fund) and RTP (Recreational Trails Program) dollars; (c) was represented as a reimbursing grant for a land purchase from Blackwell when the City already held title; (d) was used to satisfy liens on 900 Water, pay delinquent property taxes, and fund any exclusive use by the City while federal funds were undisclosed. This wire

28

constituted wire fraud under 18 U.S.C. § 1343 because: (i) it falsely represented that the City was purchasing the property when it already owned it; (ii) it concealed the involvement of federal funds requiring URA compliance; (iii) it was used to pay expenses as part of the fraudulent expenditure scheme; (iv) it is immaterial whether the defendants themselves brought about the interstate wire if they caused it to be used. This wire used federal funds without providing the required URA benefits. See Paragraph 30.

52. Between 2014 and 2017, Defendants Dickert, Mason, Ekes, Weber, Letteney, Friedel, and Palenick caused to be transmitted specific interstate electronic grant submissions and applications to HUD (CDBG funds), EPA (Brownfields cleanup funds), and other federal agencies. These submissions, including the project budgets and funding requests detailed in (**Reference Exhibit F** and incorporated by reference as if fully set forth herein), and produced in the Azarian litigation, falsely represented: (a) that the Machinery Row project was a purely private development by FDP MR, LLC; (b) that no federal funds were involved in the property acquisitions; and (c) that no URA obligations were triggered. The submissions were made via interstate electronic filing systems, email, and the IDIS/HUD grant portals and directly facilitated the receipt and use of federal funds while concealing the public acquisition from Plaintiff and similarly situated tenants.

29

53. Between 2014 and 2023, Defendants Dickert, Friedel, Palenick, and Mason caused to be transmitted interstate electronic statements, press releases, Legistar filings, and public records across state lines via internet and email (**Reference Exhibits H and L** and incorporated by reference as if fully set forth herein). These statements included: (a) representations that the Machinery Row project was "private"; (b) denials of City ownership and federal funding; (c) descriptions of Blackwell as an independent developer; (d) assurances that no public acquisition was occurring. These interstate electronic transmissions constituted wire fraud under 18 U.S.C. § 1343 because they: (i) were knowingly false when made; (ii) were intended to conceal the public/federal nature of the acquisition; (iii) were designed to prevent displaced tenants from asserting URA rights; (iv) were relied upon by Plaintiff to his detriment. These transmissions concealed Plaintiff's URA rights until 2023. See Paragraph 33.

54. On or about February 28, 2023, Defendants Ekes, Weber, and Letteney caused to be electronically filed and mailed the false statements documented in Lucareli Affidavit in Azarian v. City of Racine, Case No. 19-CV-1524 (**Reference Exhibit D** and incorporated by reference as if fully set forth herein). This affidavit: (a) was filed electronically through the Court's CM/ECF system across state lines; (b) was served via mail and electronic transmission to parties; (c) represented the DOA "Waiver of Relocation Assistance" as "true and correct"; (d) falsely stated that

"Federal funds are not involved in any aspect of the project." Ekes, Weber, and Letteney knew this statement was false because: (i) federal funds from HUD, EPA, and Knowles-Nelson had been used; (ii) the City had held title since December 31, 2014; (iii) public ownership triggered mandatory URA obligations. This filing constituted wire fraud under 18 U.S.C. § 1343 and mail fraud under 18 U.S.C. § 1341 because it was: (i) a false statement in a federal judicial proceeding; (ii) intended to conceal the fraudulent scheme; (iii) used to defeat claims of displaced tenants; (iv) material to the litigation outcome and discovery of Plaintiff's rights. This filing further concealed the true nature of the acquisition until 2023 public filings revealed the fraud. See Paragraph 34.

55. In 2023, Defendants made statements in related litigation that continued the concealment of the true nature of the acquisition. These statements are alleged not as independent predicate acts, but as evidence of Defendants' ongoing scheme and efforts to prevent discovery of the underlying fraud.

56. **VI. PATTERN OF RACKETEERING ACTIVITY (18 U.S.C. § 1961(5))**

57. The predicate acts outlined in Paragraphs 41–50 constitute a pattern of racketeering activity as defined by 18 U.S.C. § 1961(5). Under H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229 (1989), a pattern requires both relatedness and continuity.

**A. Relatedness**

31

58. The predicate acts are related because they share the following characteristics: (a) same participants: the same defendants—Blackwell, Bowman, Ekes, Weber, Letteney, Dickert, Friedel, Mason, Palenick, and Landmark Title— participated in multiple predicate acts; (b) same purpose: all predicate acts served the single purpose of concealing public ownership and federal funding to evade URA obligations while generating private benefits for Blackwell and the Enterprise; (c) same victims: the predicate acts targeted the same class of victims—displaced commercial tenants, specifically Plaintiff, who were deprived of URA relocation benefits; (d) similar methods: each predicate act used the same methodology of unrecorded deeds, misrepresented private status, and concealed federal involvement; (e) same results: each predicate act contributed to the same result—denial of mandatory relocation benefits to displaced tenants.

59. The predicate acts are not isolated or sporadic but rather interrelated components of a single criminal scheme. The acts are interdependent: the September 2014 Bowman email initiated the scheme; the December 2014 concealed deeds established the structure; the 2015-2017 predicate acts expanded and perpetuated the scheme; and the 2023 false affidavit continued the concealment.

**B. Continuity**

32

60. The predicate acts demonstrate closed-ended continuity because they occurred over more than eight years, from September 2014 through at least February 2023. This extended time period exceeds the threshold for closed-ended continuity.

61. Additionally, the predicate acts demonstrate open-ended continuity because: (a) the Enterprise's "regular way of operating" involved replicating the same concealment methodology across multiple independent redevelopment projects; (b) Resolution 17-31 (December 2017) explicitly applied the Machinery Row methodology to the Gospel Lighthouse acquisition, demonstrating the scheme's replication; (c) the TID 18 and Rootworks authorizations remain active and available for future projects; (d) the methodology is institutionalized within the RDA and City acquisition procedures; (e) the Enterprise possesses the structure and authorization to continue the scheme indefinitely; (f) the predicate acts threatening repetition pose a continuing threat to future victims.

62. This case is distinguishable from Limestone Development Corp. v. Village of Lemont, 520 F.3d 797 (7th Cir. 2008), where the predicate acts were limited to a single discrete transaction. Here, the predicate acts span eight years, involve multiple properties, demonstrate replication across projects, and are authorized to continue through active redevelopment plans. The Enterprise's regular way of

operating is evidenced by the systematic replication of the concealment methodology.

## VII. OPERATION OR MANAGEMENT (REVES V. ERNST & YOUNG)

63. Each non-municipal Defendant participated in the operation or management of the Enterprise within the meaning of Reves v. Ernst & Young, 507 U.S. 170 (1993). As detailed in ¶38 above, each made specific decisions directing the Enterprise's affairs: Blackwell and the FDP entities directed straw-purchase and development operations; Bowman controlled seller communications; Ekes directed legal documentation and drafting; Weber and Letteney exercised supervisory control over legal operations and RDA acquisitions; Landmark Title directed escrow and wire operations; and the individual municipal officials (Dickert, Friedel, Mason, Palenick) provided executive policy direction and authorization. These roles far exceeded the mere provision of services and constituted participation in the conduct of Enterprise's affairs. Each of the attorney and title-company Defendants exercised independent decision-making authority over critical transactional and concealment mechanisms, satisfying Reves. Additional detailed allegations regarding the participation of Defendants Ekes, Weber, Letteney, and Larsen in the operation or management of the Enterprise under Reves v. Ernst & Young, 507 U.S. 170 (1993), are outlined in the Addendum to Complaint (**Reference Exhibit W** incorporated by reference as if

34

fully set forth herein), filed concurrently herewith, which is incorporated by reference into this Complaint as if fully set forth herein pursuant to Federal Rule of Civil Procedure 10(c). The attorney and official Defendants (Ekes, Weber, Letteney, and Larsen) each satisfy the *Reves* "operation or management" test because they exercised independent decision-making authority and actively directed the Enterprise's affairs in ways that went far beyond the customary provision of professional legal services. Their conduct—including drafting and restructuring key concealing documents, directing the non-recording of deeds, conditioning acquisitions and evictions on fraudulent waivers, independently instructing City employees on Plaintiff's removal, orchestrating police involvement and retaliatory code enforcement, and filing false DOA statements— constituted actual participation in the operation and management of the Enterprise. *Reves*, 507 U.S. at 179; *see also United States v. Terry Christensen*, 801 F.3d 970 (9th Cir. 2015); *Mayo, Lynch & Associates, Inc. v. Pollack*, 799 A.2d 12 (N.J. Super. Ct. App. Div. 2002). The question of operation or management is generally a jury question. *United States v. Allen*, 155 F.3d 35, 42-43 (2d Cir. 1998). These allegations are supported by forthcoming exhibits (to be filed via Affidavit of Plaintiff) detailing the specific dates, instructions, and transactional acts referenced herein.

35

## VIII. INJURY TO BUSINESS OR PROPERTY, PROXIMATE CAUSE, AND STANDING

64. Plaintiff suffered injury to his business and property within the meaning of 18 U.S.C. § 1964(c).

65. Plaintiff suffered direct, concrete economic injury to his business (P&P Products, a sole proprietorship) and property within the meaning of 18 U.S.C. § 1964(c) in an amount to be proven at trial but exceeding $4,703,372 as particularized in (**Reference Exhibit M** and incorporated by reference as if fully set forth herein). These losses consist primarily of: (a) the mandatory URA relocation benefits to which Plaintiff was entitled but denied (moving expenses, replacement leasehold payments, and advisory services under 42 U.S.C. § 4623 and Wis. Stat. § 32.19); (b) documented out-of-pocket relocation, storage, and moving-loan expenses; (c) the value of lost leasehold improvements, machinery, tooling, inventory, and fixtures; and (d) business-interruption losses directly and foreseeably resulting from the abrupt, unassisted displacement. While (**Reference Exhibit M** and incorporated by reference as if fully set forth herein) includes projections of lost profits over the ensuing years, those figures are grounded in Plaintiff's historical business records, and standard URA benefit-calculation methodologies used by the City/RDA in other projects and are therefore ascertainable and non-speculative.

36

66. The injury is concrete and particularized, not speculative. Plaintiff lost the specific, statutorily defined relocation entitlements under 42 U.S.C. § 4623 and Wis. Stat. § 32.19, which are readily calculable using the same formulas the City/RDA has applied to other displaced persons. Plaintiff lost the specific statutorily defined relocation entitlements under 42 U.S.C. § 4623 (moving expenses, replacement housing payments) and Wis. Stat. § 32.19 (advisory services). The damages are ascertainable through standard relocation benefit calculations used by the City/RDA for other projects.

67. The economic loss is the direct and foreseeable result of the predicate acts. Under 49 C.F.R. § 24.101(b)(1), URA obligations attach automatically upon public acquisition; by concealing the public nature of the acquisition, Defendants prevented the automatic trigger of Plaintiff's statutory entitlements. Each dollar of URA benefits denied to Plaintiff was a dollar retained by the Enterprise in the form of reduced acquisition costs, avoided relocation expenditures, or increased development profits. This zero-sum diversion of statutorily mandated benefits satisfies the direct causation test. Because Plaintiff Fagan's leasehold at 615 S. Marquette Street was a directly dependent acquisition tainted by the ab initio fraudulent 2014 deed, his economic injuries were the proximate and intended result of every predicate act in the pattern.

37

68. Plaintiff's injuries were the direct and proximate result of Defendants' pattern of racketeering activity. Each predicate act was a but-for cause of the injury: the 2014 emails and concealed deeds (Predicate Acts 41–44) initiated and implemented the fraudulent private-transaction structure; the 2015–2017 dependent acquisitions, grant submissions, and wire transfers (Predicate Acts 45–47) expanded the scheme using federal funds; and the 2017–2023 false public statements, Resolution 17-31, and Lucareli Affidavit (Predicate Acts 48–50) continuously concealed the fraud, preventing Plaintiff from discovering and asserting his URA rights until 2023. The injuries were not only foreseeable but were the intended objective of the Enterprise. See Holmes v. Securities Investor Protection Corp., 503 U.S. 258 (1992); Bridge v. Phoenix Bond & Indemnity Co., 553 U.S. 639 (2008).

69. Plaintiff's injury is not derivative of government harm as in Anza v. Ideal Steel Supply Corp. Here, the predicate acts of mail and wire fraud were directed specifically at Plaintiff as a means of depriving him of his statutory entitlement to URA relocation benefits.

70. Defendants' misrepresentations regarding "private" acquisition status were specifically calculated to deprive displaced tenants of their URA rights, not merely to defraud federal grant agencies. The Uniform Relocation Assistance Act creates private rights in displaced persons; by concealing the public nature of the

38

acquisition, Defendants targeted Plaintiff's personal entitlement to compensation.

71. Plaintiff was the direct target of the pattern, not a collateral victim. Each predicate act—from the 2014 concealed deeds to the 2023 false affidavits—was designed to prevent Plaintiff and similarly situated tenants from learning of their relocation entitlements. The causation line is direct and unbroken, but for the concealed deeds and misrepresented acquisition status, Plaintiff would have received mandatory URA notices and relocation assistance. No superseding cause or discretionary government action intervened between the predicate frauds and Plaintiff's displacement.

72. Even after the City admitted its role as a displacing agency in the 2018 state court litigation (Case No. 2018CV001227), it provided Plaintiff only token reimbursement for expenses, but without an approved relocation plan from the Wisconsin Department of Administration (WDOA) (**Reference Exhibit S** and incorporated by reference as if fully set forth herein), further evidencing the direct and continuing economic harm caused by the Enterprise's scheme to evade full URA and state-law obligations. These state court proceedings are detailed in the State Court Filings (**Reference Exhibit Q1, Q2,** and incorporated by reference as if fully set forth herein). The limited nature of these payments is further evidenced by the Correspondence Regarding Token Payments (**Reference Exhibit R** and incorporated by reference as if fully set forth herein). The City

39

hired relocation agent Terra Venture pursuant to the Terra-Venture Contract dated 7/18/2017 (**Reference Exhibit T** and incorporated by reference as if fully set forth herein), and a no-bid extension request dated 8/21/17 (**Reference Exhibit T-1** and incorporated by reference as if fully set forth herein), with Laura Saddler acting under contract, control, and direction by Letteney. Defendants' misrepresentations and omissions were not directed solely at government agencies or the public at large, but were specifically intended to be communicated to, and relied upon by, displaced tenants, including Plaintiff. Defendants, through public statements, closing documents, and required lease termination processes, affirmatively represented that the Machinery Row acquisitions were private transactions not subject to relocation assistance requirements. These representations were communicated in the ordinary course of eviction, lease termination, and property transition, where displaced tenants necessarily rely on the acquiring party's characterization of the transaction to determine their statutory rights. As a direct result of Defendants' misrepresentations and concealment, Plaintiff did not seek, demand, or litigate for relocation benefits at the time of displacement in 2015, and instead incurred out-of-pocket expenses, lost business continuity, and accepted unfavorable terms that would not have been accepted had the true public nature of the acquisition been disclosed. Defendants' scheme thus directly caused Plaintiff to forgo specific,

40

identifiable economic protections and remedies to which he was legally entitled. No independent discretionary decision by a third party intervened between Defendants' fraudulent conduct and Plaintiff's injury. Upon public acquisition or federally assisted acquisition, URA obligations attach by operation of law. Defendants' concealment prevented the automatic triggering and enforcement of these obligations, making Plaintiff's losses the direct and intended consequence of the fraudulent scheme. Defendants' predicate acts of mail and wire fraud were not directed solely at federal or state agencies or the public at large. Instead, the Enterprise specifically targeted displaced commercial tenants—including Plaintiff Patrick Fagan and his sole proprietorship P&P Products—at the Machinery Row site. Defendants knew of Plaintiff's long-term tenancy at 615 S. Marquette Street as early as 2014–2015. They dealt directly through Olson's attorney in demand emails to evict Fagan, demanded building-code updates (fire sprinklers, new fire-water supply, and heating units) and delayed closing for 11 months under these extortion threats, as conditions precedent to the fraudulent closings, and coerced execution of the false "Waiver of Relocation Rights" (**Reference Exhibit N** and incorporated by reference as if fully set forth herein), as a condition of eviction and lease surrender in December 2015. During these direct interactions, agents of the Enterprise (including RDA personnel) affirmatively represented to Plaintiff that the acquisition was an arm's-length transaction with no URA or Wisconsin

41

relocation obligations. These misrepresentations were embodied in the purchase agreement and closing packets, requiring the waiver of tenant rights to relocation. (**Reference Exhibit N1, N2,** and incorporated by reference as if fully set forth herein). Plaintiff relied on these direct misrepresentations and the absence of any URA notices or relocation plan when he vacated the premises, incurred unreimbursed moving and storage costs, lost leasehold improvements, and suffered business interruption. The very purpose of the concealment scheme was to reduce acquisition costs by denying statutorily mandated relocation benefits to known displaced persons such as Plaintiff. This direct targeting distinguishes the present case from Anza v. Ideal Steel Supply Corp., 547 U.S. 451 (2006). In Anza, the fraud (tax evasion) was directed at the government, and the competitor's lost sales were an indirect market consequence. Here, the mail- and wire-fraud predicate acts were part of a coordinated effort to mislead displaced tenants so that Enterprise could avoid paying URA benefits. The injury to Plaintiff was therefore the first and direct step in the causal chain. See Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639, 649–60 (2008) (first-party reliance by the victim is not required; proximate cause exists where the fraud is directed at and foreseeably injures the plaintiff class); Holmes v. Sec. Inv. Prot. Corp., 503 U.S. 258, 268 (1992). Each predicate act was a but-for cause of Plaintiff's injury: without the concealed December 31, 2014, deeds and the continuing false

42

representations made directly to him, URA obligations would have attached automatically (49 C.F.R. § 24.101(b)(1)–(2)), and Plaintiff would have received the mandatory notices and benefits.

## IX. TIMELINESS

73. The four-year RICO statute of limitations applies. Agency Holding Corp. v. Malley-Duff & Assocs., Inc., 483 U.S. 143 (1987). Under Rotella v. Wood, 528 U.S. 549 (2000), the statute begins to run when the plaintiff discovers or should have discovered the injury and its predicate cause.

74. Plaintiff first discovered the concealed deeds, federal-fund misrepresentations, false affidavits, and the true nature of the acquisitions in 2023 through the public filings in Azarian v. City of Racine, Case No. 19-CV-1524. Prior to that date, Defendants actively concealed the fraud through unrecorded deeds, false public statements, false litigation affidavits, and sealed settlement agreements. Plaintiff exercised reasonable due diligence, including public records searches and attendance at city meetings, but the material facts were not discoverable through ordinary inquiry. Equitable tolling and the continuing violation doctrine, therefore, apply.

75. Defendants affirmatively concealed the material facts through mechanisms specifically designed to prevent discovery by any reasonable diligence. The City actively falsified public records by maintaining Blackwell as the apparent owner

43

in Legistar filings, press releases, and public statements (**Reference Exhibits H, L,** and incorporated by reference as if fully set forth herein), creating affirmative misrepresentations inconsistent with the true ownership status. This active and deliberate concealment of December 31, 2014, Quit Claim Deed was itself the single most effective mechanism preventing discovery of both Plaintiff's injury and the predicate acts of the RICO scheme. Because the deed was never recorded in the Racine County Register of Deeds and remained exclusively in Defendant Ekes' legal files, no title search, public records inquiry, city-meeting attendance, or other exercise of reasonable diligence by a pro se commercial tenant could have revealed the City's secret ownership or the ab initio URA violation. This foundational concealment directly caused Plaintiff's inability to discover the injury and its RICO cause until February 2023 document production and unsealing in Azarian v. City of Racine, Case No. 19-CV-1524. The ab initio fraudulent character of the originating deed, together with Defendants' continuing acts of concealment through 2023 (including the false statements lodged in Lucareli's Affidavit), tolls the statute of limitations under the doctrine of fraudulent concealment and supports application of the continuing-violation doctrine. See Rotella v. Wood, 528 U.S. 549 (2000); H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229 (1989). Defendants' concealment included affirmative acts designed to mislead Plaintiff even if he conducted reasonable inquiry, including

44

maintaining false ownership records in publicly accessible systems, structuring transactions to avoid recording requirements, and providing misleading explanations to tenants regarding the nature of the acquisition. Defendants actively and affirmatively concealed the material facts from Plaintiff personally. In addition to the unrecorded Quit Claim Deeds (**Referenced Exhibits B** and incorporated by reference as if fully set forth herein), held secretly in Defendant Ekes' files and the false public statements and Legistar filings (**Reference Exhibits H, L** and incorporated by reference as if fully set forth herein), Defendants made specific misrepresentations directly to Plaintiff during the December 2015 displacement process at 615 S. Marquette Street. Representatives of the Enterprise (Alderman Coe) told Plaintiff that the acquisition was a standard private real-estate transaction between RDA and the landlord, with no public or federal involvement and no relocation obligations. These representations were embodied in the closing documents, pre-requisite eviction, and the false "Waiver of Relocation Rights" in an attempt to circumvent URA and Plaintiff's rights (**Reference Exhibit N1, N2, N3,** and incorporated by reference as if fully set forth herein). Even after Plaintiff filed state-court actions in 2017 and 2018 seeking relocation benefits (Case Nos. 2017CV001703 and 2018CV001227; (**Reference Exhibits Q, R, S, U,** and incorporated by reference as if fully set forth herein), Defendants—under the direction of City Attorneys Weber and Letteney—

45

continued the concealment. They provided only minimal "token" reimbursement payments without a relocation plan required by WDOA and statutes (**Reference Exhibits R, S, T**, and incorporated by reference as if fully set forth herein), while still denying the dependency from full public ownership, the concealed 2014–2015 deeds, the overfunded loan structure, and the use of federal funds. These partial disclosures were themselves misleading and designed to induce Plaintiff to accept inadequate reimbursement without discovering the RICO predicate acts. Plaintiff, acting pro se, exercised reasonable diligence: he attended Common Council meetings, reviewed public records, hired counsel for the state actions, and inquired with City officials about the acquisition status. None of these efforts could reveal the unrecorded deeds or the internal concealment because those facts were exclusively within Defendants' control. These affirmative, personal misrepresentations to Plaintiff, combined with the structural concealment (unrecorded deeds, sealed Azarian materials, and false litigation positions), constituted fraudulent concealment that tolled the limitations period until Plaintiff actually discovered both the injury and its RICO cause—the concealed public acquisition and predicate acts—in February 2023 through the Azarian document production and unsealing. See Rotella v. Wood, 528 U.S. 549, 560–61 (2000) (acknowledging equitable tolling for fraudulent concealment); Sidney Hillman Health Ctr. v. Abbott Labs., 782 F.3d 922 (7th Cir. 2015) (factual disputes

46

regarding discovery and concealment are properly resolved at summary judgment).

76. Plaintiff exercised reasonable diligence to discover his URA rights: he hired counsel, attended Common Council meetings, reviewed public records concerning ownership, inquired with City officials regarding acquisition status, and reviewed published accounts of the "private" redevelopment. Despite this diligence, the material facts were exclusively within Defendants' control and knowledge. The unrecorded deeds, overfunded loan documents, internal federal fund allocation spreadsheets, and settlement agreements remained confidential and were not discoverable through any reasonable pre-complaint investigation available to a displaced commercial tenant. The district court's sealing of premature settlement documents in Azarian v. City of Racine further prevented public access to probative evidence until 2023.

77. Under Rotella v. Wood, accrual requires discovery of the injury and its predicate cause (the injurer), not discovery of the full pattern. Plaintiff discovered the direct cause (concealed public ownership and fraud) only in February 2023 when the Azarian settlement documents were unsealed revealing the December 2014 deeds and document production in Azarian included the Ekes correspondence showing federal funding concealment. Prior to this date, no public document or statement revealed the City held title to 900 Water Street as of

47

December 2014. The four-year period commenced when Plaintiff actually discovered both that he was injured and that Defendants were responsible. Plaintiff could not, through reasonable diligence, have discovered the injury and its cause before 2023 because the essential facts—public ownership and federal funding—were affirmatively misrepresented and structurally hidden in a manner that defeated ordinary investigation. No publicly available document accurately reflected the true ownership status before that time.

78. The "continuing violation doctrine" applies because Defendants engaged in ongoing concealment through the continued unrecorded status of deeds in 2015-2017, the filing of false affidavits in 2023, and the continuing suppression of URA notices to other tenants. Each affirmative act of concealment refreshed the limitations period because it was part of a unified scheme to deprive Plaintiff of his rights, with the 2023 false affidavits constituting new predicate acts within the limitations period.

79. Defendants' active concealment went far beyond merely failing to record deeds. The City maintained the false appearance of private ownership by (i) declaring FDP MR, LLC in default on a loan the City itself funded and controlled, (ii) paying property taxes and roof repairs that FDP MR never covered, and (iii) deliberately delaying foreclosure and recording of deeds it had possessed since December 31, 2014 and January 2015 until after it had secured and received the

48

fraudulent Knowles-Nelson federal grant funds in April 2017. These affirmative acts of concealment were specifically designed to, and did, prevent Plaintiff (and similarly situated tenants) from discovering the public ownership and federal funding until the 2023 Azarian disclosures. Under the doctrine of fraudulent concealment, the statute of limitations was tolled until Plaintiff actually discovered the fraud in February 2023. These affirmative acts of concealment— directed in part at Plaintiff through personal misrepresentations, the false waiver, and continued misleading positions in the 2017–2018 state litigation— were specifically designed to, and did, prevent Plaintiff from discovering the public ownership, federal funding, and RICO predicate acts until the 2023 Azarian disclosures.

80. Defendants' pattern of concealment continued even after Plaintiff filed state actions in 2017 and 2018; the City's retroactive and minimal response under Letteney's direction was designed to limit liability while maintaining the overall fraudulent scheme.

## X. CAUSES OF ACTION

### COUNT I – VIOLATION OF 18 U.S.C. § 1962(c)

81. Plaintiff incorporates by reference all preceding paragraphs. The non-municipal Defendants conducted or participated in the conduct of the Enterprise (¶¶ 36–39) through a pattern of racketeering activity (¶¶ 51–56) as described

49

herein. The Enterprise is distinct per Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 161–62 (2001); each non-municipal Defendant participated in the operation or management of the Enterprise per Reves v. Ernst & Young, 507 U.S. 170 (1993) (¶57); the pattern satisfies H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229 (1989); interstate commerce is satisfied; and Plaintiff's injuries were directly and proximately caused as detailed in ¶¶ 58–66. Plaintiff is entitled to treble damages, costs, and reasonable attorney fees under 18 U.S.C. § 1964(c).

**COUNT II – VIOLATION OF 18 U.S.C. § 1962(d)**

82. Plaintiff incorporates by reference all preceding paragraphs. The non-municipal Defendants knowingly agreed to facilitate the operation or management of the Enterprise and to participate in the scheme to conceal public ownership and federal funding. Overt acts in furtherance of the conspiracy included the predicate acts and the specific agreements and meetings described earlier. Plaintiff's injuries were the direct and proximate result of the conspiracy. Plaintiff is entitled to treble damages, costs, and reasonable attorney fees.

**COUNT III – VIOLATIONS OF WIS. STAT. § 32.05**

83. Plaintiff incorporates by reference all preceding paragraphs. Defendants acquired or assisted in acquiring the Machinery Row parcels for public purposes using public and federal funds, triggering mandatory relocation benefits under

50

Wis. Stat. § 32.05. Defendants failed to provide any such benefits, resulting in the economic injury detailed in ¶¶ 58–66.

**COUNT IV – VIOLATIONS OF WIS. STAT. § 32.06**

84. Plaintiff incorporates by reference all preceding paragraphs. The acquisitions constituted public acquisitions requiring just compensation and relocation assistance under Wis. Stat. § 32.06. Defendants failed to initiate condemnation proceedings or provide any such compensation or assistance, causing Plaintiff the economic injury detailed in ¶¶ 58–66.

**COUNT V – VIOLATIONS OF WIS. STAT. § 32.19**

85. Plaintiff incorporates by reference all preceding paragraphs. Defendants were required to provide advisory services concerning relocation under Wis. Stat. § 32.19 but intentionally concealed the public nature of the acquisitions to prevent Plaintiff from receiving them, resulting in the economic injury detailed in ¶¶ 58–66.

**COUNT VI – VIOLATIONS OF WIS. STAT. § 32.25**

86. Plaintiff incorporates by reference all preceding paragraphs. Defendants were required to minimize hardship to displaced persons under Wis. Stat. § 32.25, but instead maximized Plaintiff's hardship through concealment, resulting in the economic injury detailed in ¶¶ 58–66.

**COUNT VII – CIVIL CONSPIRACY TO VIOLATE WISCONSIN RELOCATION STATUTES**

87. Plaintiff incorporates by reference all preceding paragraphs. Defendants Ekes, Weber, Letteney, Dickert, Friedel, Mason, and Palenick knowingly agreed to conceal public ownership and federal funding to evade relocation obligations under Wis. Stat. §§ 32.05, 32.06, 32.19, and 32.25. Overt acts in furtherance included drafting the City Developers Agreement, holding deeds unrecorded, issuing false public statements, and filing false affidavits. As a direct and proximate result, Plaintiff suffered the economic injury detailed in ¶¶ 58–66.

**COUNT VIII – DECLARATORY AND INJUNCTIVE RELIEF**

88. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

89. An actual controversy exists under 28 U.S.C. § 2201 between Plaintiff and all Defendants regarding: (a) whether Defendants violated 18 U.S.C. §§ 1962(c) and (d); (b) whether Defendants violated the URA and Wisconsin relocation statutes; (c) whether Plaintiff is entitled to relocation benefits; (d) whether Defendants' fraudulent acquisition methodology violates RICO and state law; (e) whether acquisition of future properties must comply with URA. Any purported waiver of relocation benefits executed by or on behalf of Plaintiff is null and void ab initio

and provides no defense to Defendants' obligations under the URA and Wisconsin statutes.

90. Plaintiff seeks declaratory judgment that: (a) Defendants violated 18 U.S.C. §§ 1962(c) and (d) through the scheme described herein; (b) the Machinery Row acquisitions were public or publicly assisted requiring URA compliance; (c) Plaintiff is entitled to relocation benefits under the URA and Wisconsin statutes; (d) the Defendants' fraudulent concealment methodology violates law.

91. Plaintiff seeks permanent and mandatory injunctive relief under 28 U.S.C. § 2202 and Rule 65, requiring: (a) Defendants to record all unrecorded deeds transferring Machinery Row properties; (b) Defendants to provide full URA relocation benefits to Plaintiff, including moving expenses, replacement leasehold location, and advisory services; (c) Defendants to cease using the unrecorded deed methodology to conceal public ownership; (d) Defendants to provide mandatory URA notices to all current and future tenants in TID 18 properties; (e) Defendants to establish a compliance protocol ensuring all future acquisitions comply with URA and Wisconsin relocation statutes; (f) Defendants to disgorge and account for all federal funds obtained through fraudulent concealment; (g) Defendants to preserve all documents relating to Machinery Row and TID 18 acquisitions.

92. Plaintiff has no adequate remedy at law because monetary damages cannot reverse the ongoing concealment or restore lost relocation benefits, and declaratory relief is necessary to establish Plaintiff's rights and prevent ongoing violations.

## XI. PRAYER FOR RELIEF WHEREFORE, Plaintiff respectfully requests that the Court:

93. Enter declaratory judgment pursuant to 28 U.S.C. § 2201 declaring Defendants' violations of RICO, the URA, and Wisconsin relocation statutes;

94. Grant permanent and mandatory injunctive relief pursuant to 28 U.S.C. § 2202 and Rule 65 ordering the relief described in ¶85 of the Complaint;

95. Award treble damages against the non-municipal Defendants totaling $14,110,116 ($4,703,372 base × 3) pursuant to 18 U.S.C. § 1964(c);

96. Award compensatory damages consisting of the specific losses to P&P Products detailed in ¶¶ 58–66 and (**Reference Exhibit M** and incorporated by reference as if fully set forth herein), totaling $4,703,372;

97. Award costs, reasonable attorneys' fees, and expenses under 18 U.S.C. § 1964(c);

98. Award pre- and post-judgment interest at the maximum lawful rate;

99. Retain jurisdiction to enforce all orders and judgments entered in this action; and

54

100. Grant such other and further relief as the Court deems just and proper.

Respectfully submitted, Dated: May 6, 2026,

Patrick Fagan Pro Se Plaintiff

3943 Pinehill Blvd.

Mt. Pleasant, WI 53403

(262) 880-7237 (920) 256-2096

passportsilver@icloud.com

## REFERENCE EXHIBIT INDEX

### (Incorporated by Reference Pursuant to FRCP 10(c))

Due to the voluminous nature of the exhibits, Plaintiff will promptly file true and correct copies of all Exhibits separately as an attachment to a supporting Affidavit of Plaintiff. Pursuant to Federal Rule of Civil Procedure 10(c), all Exhibits listed below are incorporated by reference into this Complaint as if fully set forth herein. Each Exhibit is referenced in the specific paragraphs of the Complaint identified below.

Exhibit A: City Developers Agreement (September 29, 2014) — Referenced in ¶¶ 29, 45.

Exhibit B: Unrecorded Deeds (December 31, 2014) [EKES DEPOSITION] —

Referenced in ¶¶ 30, 46, 73.

Exhibit C: Knowles-Nelson Grant Wire/Bank Check information (April 10, 2017) —

Referenced in ¶¶ 34, 49.

Exhibits C1–C8: Knowles-Nelson Grant 2nd Amended Escrow Agreement —

Referenced in ¶¶ 34, 49.

Exhibit D: False Affidavits (Azarian v. City of Racine, Case No. 19-CV-1524, Doc.

133) — Referenced in ¶¶ 38, 52.

Exhibit E: Email from Bowman (September 25, 2014) — Referenced in ¶¶ 28, 44.

Exhibit F: Project Budgets Showing Federal Funds — Referenced in ¶¶ 35, 50.

Exhibit G: TID 18 Legal Review with Letteney's Signature 9/10/2014 — Referenced

in ¶ 17.

Exhibit H: Public Statements, Press Conference, and Timeline (2014-2023) —

Referenced in ¶¶ 37, 38, 51, 73.

Exhibit I: Original and Amended Escrow Ledgers (2014-2023) — Referenced in ¶¶

31, 47.

Exhibit J: Resolution 17-31 (December 7, 2017) and RDA Board Minutes —

Referenced in ¶ 36.

Exhibit K: Rootworks Area-Wide Plan (2012) — Referenced in ¶ 36.

Exhibit L: Racine Legistar Committee of the Whole Records (transcribed) — Referenced in ¶¶ 37, 51, 73.

Exhibit M: RICO Damages Calculation for P&P Products — Referenced in ¶¶ 3, 63 (and throughout Injury/Damages sections and RICO Case Statement).

Exhibit N: Waiver of Relocation Rights (12/31/2014) — Referenced in ¶ 30 (and RICO Case Statement).

Exhibit N2: Waiver of Relocation Rights in Purchase Agreement (12/31/2014) — Referenced in ¶ 30.

Exhibit N3: Waiver of Relocation Rights (12/30/2015) — Referenced in ¶ 30.

Exhibit O: Loan Default → Foreclosure → Record Deeds → Demolition — Referenced in ¶ 32.

Exhibits O1–O4: Filing Ab Initio Deed with Register of Deeds (Dec 2017) — Referenced in ¶ 32.

Exhibit P: Tax and Repair Payment Records — Referenced in ¶ 32. Exhibit Q: Plaintiff's State Court Filings; Case Number 2017CV001703 — Referenced in ¶ 70 and related state-court/timeliness sections.

Exhibit Q2: Plaintiff's State Court Filings; Case Number 2024CV000223 — Referenced in ¶ 70 and related state-court/timeliness sections.

Exhibit R: Kutzler Reimbursement — Referenced in ¶ 70 and related timeliness/injury sections.

Exhibit S: WDOA Never Approved a 615 Marquette Relocation after revisions —
Referenced in ¶ 70 and related timeliness/injury sections.

Exhibit T: Terra-Venture Contract and no-bid extension — Referenced in ¶¶ 17,
70.

Exhibit U: Olson State Case 2018CV001250 — Referenced in ¶¶ 17, 70, 73.

Exhibit V: Related litigation Azarian v. City of Racine, Case No. 19-CV-1524, with
undisclosed settlement outcome — Referenced in ¶ 4.

Exhibit W: ADDENDUM/SUPPLEMENT TO COMPLAINT — Referenced in ¶ 63.

## PLAINTIFF'S RICO CASE STATEMENT

### (Pursuant to Local Practice and FRCP 9(b) Requirements)

This RICO Case Statement supplements the Complaint and is incorporated by
reference solely for the purpose of providing the Court and Defendants with a
clear, organized checklist of the RICO elements.

**Defendants subject to RICO damages** (non-municipal Defendants sued in their
individual capacities): John Dickert (individually), Thomas Friedel (individually),
Cory Mason (individually), James Palenick (individually), Rodney Blackwell
(Iowa), James K. Bowman (Illinois), FDP MR, LLC (Wisconsin), Financial District
Properties, LLC (Iowa), FDP Acquisitions, LLC (Iowa), Elaine Ekes (Wisconsin),

58

Robert Weber (Wisconsin), Scott Letteney (Wisconsin), Landmark Title of Racine, Inc. (Wisconsin), Nicole Larsen (Wisconsin), Laura Sadler (Wisconsin), and Terra Venture Advisors, LLC (Wisconsin).

Municipal Entity Defendants (City of Racine and RDA) are named solely for declaratory and injunctive relief. John Does 1–2 will be identified through discovery.

**Enterprise**: An association-in-fact Enterprise as described in Complaint ¶¶ 40–42, consisting of all Defendants operating with a functional hierarchy:

- **Policy Level**: Dickert, Mason

- **Operational Management**: Dickert, Mason, Friedel, Palenick

- **Legal Operations**: Weber, Letteney, Ekes, Larsen

- **Financial / Escrow Operations**: RDA, Landmark Title

- **Straw Purchasers / Developers**: Blackwell, Bowman, FDP Entities

- **Fraudulent Relocation Services**: Laura Sadler and Terra Venture Advisors, LLC

The Enterprise has existed with sufficient longevity from September 2014 through at least February 2023 (and continues through active TID 18 and Rootworks redevelopment authorizations).

**Predicate Acts** (Mail and Wire Fraud – 18 U.S.C. §§ 1341, 1343): The following specific acts are pled with particularity under FRCP 9(b). Each act was committed

59

in furtherance of the Enterprise's scheme to conceal public ownership and federal funding to evade URA obligations:

1. September 25, 2014 – Interstate email by James K. Bowman (Illinois to Wisconsin) regarding "simple fix" and "reset tactic" to conceal City involvement (Complaint ¶¶ 28, 44–45). 2–3. September 29 – December 31, 2014 – Interstate emails transmitting drafts and final City Developers Agreement by Elaine Ekes (under supervision of Weber and Letteney) (Complaint ¶¶ 29, 46–47).

2. December 31, 2014 – Mailing/Couriering of unrecorded Quit Claim Deeds by Blackwell and Ekes (Complaint ¶¶ 30, 48).

3. December 31, 2014 – Commenced Interstate wire transfers of approximately $450,000 overfunded loan proceeds through Landmark Title (Complaint ¶¶ 31, 49).

4. 2015 – Mailings of closing packets for dependent acquisitions at 526 and 615 S. Marquette Street (Complaint ¶ 50).

5. April 10, 2017 – Interstate wire transfer of $470,750 Knowles-Nelson funds (Complaint ¶¶ 34, 51).

6. 2014–2017 – Interstate electronic grant submissions to HUD, EPA, and other federal agencies containing false representations (Complaint ¶ 52).

60

7. 2014–2023 – Interstate electronic public statements, press releases, and Legistar filings falsely describing the project as private (Complaint ¶ 53).

8. February 28, 2023 – Electronic filing and mailing of false statements included in Lucareli Affidavit in *Azarian v. City of Racine* (Complaint ¶ 54).

**Additional Predicate Acts (from Addendum – Reference Exhibit W)**: 11. **Fraudulent Procurement of No-Bid Contract (Wire Fraud)** – On or about August 21, 2017, Nicole Larsen transmitted via interstate email the $175,000 no-bid contract with Terra Venture Advisors, falsely representing it as legitimate relocation services (Addendum ¶ 19). 12. **Direction to Conceal Statutory Entitlements (Wire Fraud / Honest Services Fraud)** – In August 2017, Nicole Larsen transmitted instructions via interstate email and/or telephone directing Terra Venture Advisors not to inform displaced tenants (including Plaintiff) of their full URA and Wisconsin statutory entitlements (Addendum ¶ 19).

**Pattern of Racketeering Activity** (18 U.S.C. § 1961(5)): The predicate acts satisfy both **relatedness** and **continuity** under *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229 (1989).

**Relatedness**: All acts share the same participants, same purpose (concealment of public ownership and federal funds to evade URA obligations), same victims (displaced commercial tenants, including Plaintiff), similar methods (unrecorded

61

deeds, false representations, concealed wires), and same results (denial of mandatory relocation benefits).

**Continuity:**

- **Closed-ended continuity**: Predicate acts span more than eight years (September 2014 – February 2023).

- **Open-ended continuity**: The Enterprise's regular way of operating includes replication of the same methodology (see Resolution 17-31 applying the Machinery Row scheme to new properties), ongoing TID 18 and Rootworks authorizations, and institutionalized concealment practices that pose a continuing threat of future violations.

**Operation or Management** (*Reves v. Ernst & Young*, 507 U.S. 170 (1993)): Each non-municipal Defendant participated in the operation or management of the Enterprise by exercising direction and control over its affairs, far beyond the provision of ordinary services. Detailed allegations are outlined in Complaint ¶¶ 15–21, 63, and in the Addendum/Supplement (Reference Exhibit W).

Specific participation of newly added defendants:

- **Nicole Larsen**: Exercised independent operational control by procuring the no-bid Terra Venture contract, directing concealment of tenants' full statutory entitlements, and coordinating suppression of public records (Predicate Acts 11 and 12).

62

- **Laura Sadler** and **Terra Venture Advisors, LLC**: Knowingly entered into and performed under the sham relocation-services contract whose purpose was to create the false appearance of URA compliance while actually limiting or denying full benefits to displaced tenants, including Plaintiff.

- All attorney Defendants (Ekes, Weber, Letteney, Larsen) exercised independent decision-making authority over key documents, escrow conditions, recording decisions, and relocation protocols.

**Injury to Business or Property and Proximate Cause**: Plaintiff suffered direct, concrete economic injury to his business (P&P Products) and property in the amount of **$4,703,372** (detailed in Reference Exhibit M). These damages include lost URA relocation benefits, moving/storage expenses, lost leasehold improvements, and business interruption losses.

The injury was the direct and proximate result of the pattern of racketeering activity. The Enterprise specifically targeted displaced tenants at Machinery Row (including Plaintiff) through direct misrepresentations, coerced waivers, and concealment of the public acquisition. Each predicate act was a but-for cause of Plaintiff's injury. *See Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639 (2008); *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258 (1992). Plaintiff's injury is not derivative and satisfies RICO standing requirements.

63

**Timeliness:** Plaintiff first discovered the concealed deeds, federal funding, and the full RICO cause of action in **February 2023** through document production and unsealed materials in *Azarian v. City of Racine*, Case No. 19-CV-1524. Before that date, Defendants actively concealed the fraud through unrecorded deeds, false public statements, false affidavits, and sealed litigation materials. Equitable tolling and the continuing violation doctrine apply under *Rotella v. Wood*, 528 U.S. 549 (2000).

**Relief Sought:**

- Treble damages of **$14,110,116** against all non-municipal Defendants pursuant to 18 U.S.C. § 1964(c);

- Compensatory damages of **$4,703,372**;

- Costs, reasonable attorney's fees, and expenses;

- Declaratory and permanent injunctive relief as set forth in the Complaint;

- Pre- and post-judgment interest; and

- Such other relief as the Court deems just and proper.

Respectfully submitted,

Dated: May 6, 2026

Patrick Fagan, Pro Se Plaintiff
3943 Pinehill Blvd.
Mt. Pleasant, WI 53403
(262) 880-7237 • (920) 256-2096
passportsilver@icloud.com

64